UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| TIMOTHY WAYNE MURRAY | CIVIL ACTION NO.:  10-1755 |
| | SECTION:  "A" |
| VERSUS | MAGISTRATE:  03 |
| RODNEY JACK STRAIN, JR., ET AL. | JURY DEMAND |

## AFFIDAVIT OF DR. RICHARD INGLESE

**STATE OF LOUISIANA**

**PARISH OF ST. TAMMANY**

**BEFORE ME**, Notary Public, came and appeared Dr. Richard Inglese, Medical Director of the St. Tammany Parish Jail, who after being duly sworn did depose and state:

1.      I am Dr. Richard Demaree Inglese and I have a M.D. degree from the University Of Pennsylvania School Of Medicine and I am licensed to practice medicine in the state of Louisiana.

2.      I have been qualified as an expert in both state and federal courts in the areas of internal medicine, correctional health care, infection control, HIV, Hepatitis C, and Tuberculosis.

3.      I have the qualifications and professional experience set forth in the attached Curriculum Vitae.

4.      Among my other duties, I am the Medical Director of the St. Tammany Parish Jail and I know the facts set forth in this affidavit of my own personal knowledge.

5.      I have personally reviewed the St. Tammany Parish Jail Medical Records of inmate Timothy Wayne Murray.

6.      The St. Tammany Parish Jail Medical Staff responded to numerous requests for medical treatment made by inmate Timothy Wayne Murray, and after doing so, I composed the attached medical report, which summarizes my findings from the review of those records.

7.      The facts set forth in the attached medical report are true and accurate and the medical opinions stated therein are my medical opinions based upon my education, training, and experience in the field of medicine.

_____

Richard D. Inglese, M.D.

Sworn to and subscribed before me,
this _6th_ day of January, 2012.

_____
           Notary Public
Printed Name: GARY L. HANES
La. Bar No. 14341

2

# CURRICULUM VITAE

## RICHARD INGLESE, M.D.

**GENERAL INFORMATION:**

Date of Birth:  25 September 1965  
Home Address: 1314 Napoleon Avenue  
Unit #8  
New Orleans, LA 70115

Work Phone:  (985) 276-1055  
Home Phone:  (504) 251-6372

**CURRENT EMPLOYMENT:**

**St. Tammany Parish Sheriff's Office**  
Medical Department  
1200 Champagne St.  
Covington, LA  70433  
(April 1, 2004 – present)

**Medical Director:**

The St. Tammany Parish Sheriff's Office (STPSO) is a medium-sized county (parish) jail which books approximately 20,000 persons annually and supports a resident population of 1,300 inmates.  On April 1, 2004, I was appointed Medical Director for STPSO.  Prior to my appointment, health care services at the jail were contracted from a private physician group.  Upon my arrival, I designed, hired, and trained an entire on-site medical staff.  The department provides general medical, dental, and psychiatric care to inmates and also supports numerous ancillary health-related functions:  quality improvement, education and training, infection control, employee health, medical supply, on-site pharmaceutical services, laboratory services, x-ray services, referral scheduling, and medical records.  All of these services are new to the jail, implemented under my supervision as Medical Director.  The jail and its Medical Department were devastated by Hurricane Katrina in August of 2005.  I supervised the rebuilding of the department post-storm.  Currently, Medical Department personnel include the Medical Director, 5 physicians, 2 psychiatrists, 2 dentists, 16 nurses, and seven additional support staff.

**Deputy Sheriff:**

Since 2005, I have been a deputized officer for the St. Tammany Parish Sheriff's Office.  I currently hold the rank of captain.

1

**Tulane University School of Medicine**
New Orleans, LA  70118
(Nov. 2000 – present)

**Assistant Professor of Medicine:**

As part of the General Internal Medicine faculty, I participate directly in patient care. In addition, I have an active role in medical education, supervising both residents and medical students at the Medical Center of Louisiana, New Orleans, and at STPSO.  I am also an instructor in the *Foundations in Medicine* course for first year students and assist with medical school admissions, interviewing potential applicants to the program.  My services to Tulane are provided gratis.

**Medical Consultant**
Self employed
(July 2000 – present)

**Medical Consulting / Expert Witness:**

For the past eight years, I have worked as an independent contractor, providing consulting services to numerous agencies in need of medical opinions.  I have consulted with various parish and state correctional facilities, evaluating medical operations, medical budgets, pharmacy services, compliance with accreditation standards, and adherence to prevailing standards of medical care.  I also regularly provide medical consultation to several legal firms, performing chart reviews and testifying as an expert witness.  I have been qualified as a medical expert in the areas of internal medicine, emergency medicine, correctional health care, infection control, infectious disease, HIV, Hepatitis C, Tuberculosis, and alcohol intoxication.  While my focus is primarily medical malpractice (and medical-related section 1983 claims), I have also testified as an expert in criminal court, working with the Louisiana State Attorney General's Office as well as the City of New Orleans Public Defender's Office. Finally, I have served as a "sentinel event" investigator for the Surgeon General of the United States Air Force and as an expert medical advisor for the U.S. Navy.

**Author**
(September 2006 – present)

In July 2007, Kensington Publications released *No Ordinary Heroes*, the true story of the Orleans Parish Jail during and after Hurricane Katrina.  I authored the 332 page, hard-cover book which made local bestseller lists after its first week of release.  The story chronicles the actions of the OPSCO medical staff as we struggled to survive the storm and its harrowing aftermath.  Without power or water, and cut off from outside assistance, the medical staff worked to care for more than 7,000 inmates, deputies, families, and local residents. However, as the flood water rose, supplies dwindled, and inmate rioting escalated, conditions deteriorated rapidly inside the jail, and the staff found themselves in a fight for survival. Written in the style of a thriller, *No Ordinary Heroes* recreates six days which felt like an eternity to the dedicated men and women who worked to the breaking point and beyond. *Fine Print Productions* is currently developing the book for a major motion picture. In additionally, I have begun work on my second book, a medical thriller.

2

**PREVIOUS EMPLOYMENT:**

**Orleans Parish Criminal Sheriff's Office (OPCSO)**
2800 Gravier St.
New Orleans, LA  70119
(February 2000 – October 2009)

**Staff Internist / Infectious Disease Specialist:**
(July 2006 – Oct. 2009)

     Following Hurricane Katrina (August 2006), OPCSO lost many resources assisting with the care of inmates with HIV, Tuberculosis, and Hepatitis C infections.  In specific, OPCSO lost their entire Infection Control Department and all staff physicians experienced in the treatment of infectious diseases.  The jail also lost access to Charity Hospital's HIV Outpatient Clinic, and the regional Office of Public Health was decimated by the storm.  I volunteered as part-time staff in order to provide inmates with a practitioner experienced in the treatment of these diseases.  Prior to the hurricane, I oversaw an HIV Clinic and sat on the AIDS Planning Council, helping to procure funding for HIV treatment in incarcerated populations.

**Medical Director:**
(Feb. 2000 – July 2006)

     Prior to Hurricane Katrina, The Orleans Parish Criminal Sheriff's Office (OPCSO) was one of the largest jails in the United States, processing approximately 105,000 persons each year.  Nearly 6,000 inmates were incarcerated with OPCSO at any one time.  The Medical Director was responsible for the health care of those inmates and oversaw the entire Medical Department which was quite large, employing 16 full-time physicians, 8 dentists, 2 podiatrists, 70 nurses, 15 medical assistants, and over 30 additional support personnel.  With an operating budget of 11 million dollars, the department was expansive, maintaining the following medical facilities on-site: an acute care clinic, a skilled nursing facility, an in-patient psychiatric unit, 12 separate general medicine clinics, a diabetic housing unit, and a housing unit for individuals with advanced HIV disease.  Likewise, OPCSO offered a broad range of medical services including emergency medical care, medical sick-call, psychiatry, general dentistry, OB/GYN, orthopedics, physical therapy, podiatry, and various chronic care medical clinics (Asthma Clinic, Cardiology Clinic, Diabetic Clinic, Epilepsy Clinic, Hypertension Clinic, and Internal Medicine Clinic).  In addition, OPCSO had a large Infection Control Department which supported an active Tuberculosis Clinic, HIV Clinic, Hepatitis Clinic, and Sexually Transmitted Disease Clinic.

The Medical Director provided leadership for the entire department overseeing medical care, developing new programs, implementing new policies, supervising daily operations, and integrating medical services with security functions.  The Director was responsible for each division of the Medical Department: Administration, Quality Improvement, Education and Training, Infection Control, Medical Supply, Primary Care, General Dentistry, Psychiatry, and Social Services.  Additionally, the Medical Director served as liaison to various external

3

organizations including regional medical centers, local medical schools, community-based health care programs, the Office of Public Health (OPH), and other state and federal correctional facilities. The Director negotiated and monitored contracts with those outside agencies. The Medical Director maintained an active presence in the community, supervising several public health programs, administrating a satellite clinic for OPH, recruiting at local nursing schools, and participating in various public relations programs. The Director supported various grants and research initiatives in conjunction with OPH, the Centers for Disease Control, and local medical schools. During my tenure as Medical Director, the jail achieved accreditation by both the National Commission on Correctional Health Care (NCCHC) and the American Correctional Association (ACA).

Following Katrina, I supervised the rebuilding of the jail's Medical Department for nearly a year. The jail had been destroyed by the storm, and I guided the redesign of the Medical Department in a city with crippled health care resources. During this year, the jail grew from 83 inmates in October of 2005 to 2,200 inmates by July of 2006 when I left my position as Medical Director to pursue other interests.

**Interim Medical Administrator:**
(July 2001 – July 2002)

The Medical Administrator supervised the daily operations of the Medical Department overseeing the various components: Clinic Operations, Credentials, Education and Training, Infection Control, Information Management, Medical Supply, Nursing Services, Quality Improvement, and Medical Records. The Administrator also monitored ancillary services such as dietary, emergency transport, lab, pharmacy, waste management, and x-ray services. Additionally, the Administrator was intimately involved with personnel issues including staffing, scheduling, payroll, and disciplinary matters. The Medical Administrator coordinated all department functions to ensure orderly operation.

**Director of Infection Control:**
(Feb. 2000 – July 2006)

The Orleans Parish Criminal Sheriff's Office maintained a large Infection Control Department to prevent and/or treat communicable diseases among inmates and facility staff. Twenty percent of inmates had latent tuberculosis infection, five percent were infected with HIV, and thirty percent carried the hepatitis C virus. Consequently, the Director oversaw active Tuberculosis, HIV, Hepatitis, and Sexually Transmitted Disease Clinics. The Director was also responsible for infectious disease consultations within the facility and for maintaining employee immunization and in-service training records.

**Office of Public Health**
TB Control Section
325 Loyola Avenue  P.O. Box 60630
New Orleans, LA  70160
(July 2002 – October 2009)


Beginning in the summer of 2002, I provided medical services free of charge to the Region 1 Office of Public Health, staffing tuberculosis screening and treatment centers within the city of New Orleans.  My duties included direct care, training and education of patients and clinic staff, and representing OPCSO on the *Governor's Task Force on Tuberculosis*.


**West Jefferson Medical Center**
Marrero, LA  70072
(June 1999 – Feb 2000)


**Hospitalist:**

In this position, I functioned as the sole hospitalist for a private medical group consisting of nine physicians and one nurse practitioner.  I was responsible for the admission, discharge, and daily management of patients admitted from our group and from the Emergency Department.  This included patients admitted to the medical floor as well as patients admitted to the Intensive Care and Cardiac Care Units.  In addition to my role as primary attending physician, I had an extensive role as medical consultant.  I was routinely consulted to see our group's patients in the Emergency Department.  I also followed our patients after their admission to other primary services such as cardiology, orthopedics, or rehabilitation medicine.  Lastly, I maintained an active outpatient clinic consisting of recently discharged patients.


**Malcolm Grow USAF Medical Center**
89th Medical Group
Andrews AFB, MD  20762
(July 1996 – June 1999)


**Staff Internist:**

My primary duties in this 185 bed hospital included the following:  I served as attending physician to the Intensive Care Unit, the Cardiac Care Unit, and the general medicine ward.  Furthermore, I functioned as internal medicine consultant to the Emergency Department, Primary Care Department, and the Departments of Surgery and OB/GYN, while also acting as *Medical Admitting Officer of the Day*.  I was the primary care provider for 1000 outpatients, but also staffed an acute care clinic.  In addition, I supported the medicine subspecialty clinics by performing flexible sigmoidoscopy and exercise-treadmill testing (over 1000 performed).

**Internal Medicine Training Officer:**

Malcolm Grow Medical Center was a teaching hospital which supported 30 family practice residents, 10 transitional internship residents, and medical students from the Uniformed Services University of the Health Sciences (USUHS). As internal medicine training officer, I oversaw medical curriculum for the ICU, CCU, medicine ward, and ambulatory medicine rotations. Also, I served as course director for the internal medicine lecture series. (I personally delivered 48 of the 240 yearly lectures and developed 7 syllabi for the course.) In addition, I worked closely with medical students from USUHS, directing a second year *Physical Diagnosis* course and all fourth year subinternships in the Department of Medicine.

**Critical Care Air Transport (CCAT)Team Leader:**

CCAT teams are tasked with the air transportation of seriously injured or critically ill patients. These operations involve both short-distance air lifts and long-distance, intercontinental, air transports.

**Additional Duties:**
Director, Cardiovascular Stress Testing
Course Director, Advanced Cardiac Care: Physiology, Dysrrhythmias,
    and ACLS Interventions
Course Director, Advanced Cardiac Life Support
Interviewer, USUHS Admissions Committee
Instructor, Critical Care Nursing Course
Basic Life Support Instructor
Health Records Committee Member

**USAF Hospital / 51st Medical Group**
Osan Air Base, Republic of Korea
(July 1995 – July 1996)

**Chief, Medical Services Flight:**

The Chief of Medical Services Flight supervised the Primary Care Clinic, Internal Medicine Clinic, and the Emergency Department at the USAF Hospital Osan. This facility provided 68,000 outpatient visits and 850 inpatient admissions per year. The flight chief also oversaw both the 25-bed, inpatient, medical ward and the outpatient records department.

**Chief, Internal Medicine:**

The Chief of Internal Medicine coordinated the department which included general internal medicine, cardiology, neurology, and dermatology. Furthermore, I served as the primary internal medicine consultant to Air Force medical practitioners in Korea. Other duties included arranging all medical air evacuations from Osan Air Base, as well as personally accompanying all emergent air evacuations.

**Chief, Disaster-Casualty Team:**

As team chief, I organized and trained a medical unit to function as a disaster-response team. This unit was also prepared to function as a wartime treatment crew. I served as the primary instructor, training members in advanced trauma life support, the treatment of battlefield injuries, and the management of chemical warfare casualties.

**Additional Duties:**

Medical Director of the hospital Emergency Department
"Medical Officer of the Day"- intermittent duty as primary Emergency Department physician
Director, Laboratory Medicine
Director, Coumadin Clinic
Director, Tuberculosis Clinic
Chemical warfare consultant to the 51st medical group

Committee Member:
       Executive Committee of the Medical Staff
       Pharmacy and Therapeutics
       Credentials Committee

Educational Duties:
       Course Director, Advanced Cardiac Care:  Physiology, Dysrhythmias,
          and ACLS Interventions
       Course Director, Advanced Cardiac Life Support
       Director, medical student education
       Instructor, National Registry of Emergency Medical Technicians

## ACADEMIC APPOINTMENTS:

Tulane University School of Medicine
       New Orleans, Louisiana
       Assistant Professor of Medicine
       November 2000 -- present

Uniformed Services University of the Heath Sciences
F. Edward Hebert School of Medicine
       Bethesda, Maryland
       Assistant Professor of Medicine
       July 1996 – June 1999

Dan Kook University
College of Medicine
       Suwan, Republic of Korea
       Clinical Assistant Professor
       March 1996 -- June 1999

University of Maryland, Asian Division
    Osan Air Base, Republic of Korea
    Instructor, Human Biology
    March 1996 -- May 1996


**EDUCATION**:

1992-1995   USAF Medical Center Keesler
              Keesler AFB, MS
              Internal Medicine Residency

1987-1992   University of Pennsylvania School of Medicine
              Philadelphia, Pennsylvania
              Medical Doctorate
                      Distinctions: Health Professions Scholarship Program Recipient

1983-1987   Case Western Reserve University
              Cleveland, Ohio
              Bachelor of Arts in Chemistry

                    Distinctions:    Summa cum Laude
                                      Phi Beta Kappa
                                      The Freshman Chemistry Achievement Award
                                          (Outstanding Student in Freshman Chemistry)
                                    The Merck Index Award
                                        (Outstanding Student in Organic Chemistry)
                                    The Lubrizol Corporation Award
                                        (Top Graduate in Chemistry)
                                    Ukrainian Association Scholarship
                                        (Academic Achievement)
                                    Western Reserve Scholar; Dean's List


**SPECIALIZED TRAINING:**

Trauma and Emergency Medicine
    Critical Care Air Transport Course, School of Aerospace Medicine, Brooks AFB, TX, 1997
          96 CME hours of instruction on the stabilization, management, and transportation of
          critically ill patients
    Fundamental Critical Care Course, Society of Critical Care Medicine, Brooks AFB, TX, 1997
    Staff Physician, Emergency Department, 51st Medical Group, Osan AFB, ROK, 1995-96
          Over 400 hours as primary Emergency Department physician
    Disaster-Casualty Training, Osan AFB, ROK, 1995-96
          75 hours of specialized training on the treatment of mass casualties, battlefield
          injuries, and victims of multiple trauma
    Primary physician for Emergency Air Evacuation, Osan AFB, ROK. 1995-96
          Over 100 hours of patient transport time; Experienced in both airplane and helicopter
          transport

Combat Medicine/Medical Readiness Training 1996, 1995
Combat Casualty Care Course, Camp Bullis, TX, 1995
Advanced Trauma Life Support, Brook Army Medical Center, TX, 1995

Chemical Warfare Training
Chemical Warfare Consultant to the 51st Medical Group, Pacific Air Command, ROK, 1995-96
  Expert in the management of chemical warfare injuries
Medical Red Flag Training, Davidsonville, MD 1997
Chemical Warfare Training, Camp Bullis ,TX 1995
Chemical and Biologic Defense Training, 1998, 1996, 1995

Hyperbaric and Hypobaric Medicine
The School of Aerospace Medicine, Brooks AFB, TX, 1997,1988
Chamber Medical Attendant, The Institute for Environmental Medicine
  University of Pennsylvania Medical Center, Philadelphia, PA, 1988-92


## MILITARY SERVICE:

| | |
|---|---|
| 1999 | Honorably discharged from the USAF |
| 1998 | Promoted to the rank of Major |
| | Served as Internal Medicine Consultant to the Surgeon General of the Air Force as a *Medical Incident Investigator* |
| | Awarded the Air Force Achievement Medal |
| 1996 | Assigned to Malcolm Grow USAF Medical Center, Andrews AFB, MD |
| | Awarded the Air Force Commendation Medal |
| 1995 | Assigned to USAF Hospital Osan, Osan Air Base, Republic of Korea |
| | Attended Combat Casualty Care Course, Camp Bullis, TX |
| 1992 | Promoted to the rank of Captain |
| | Assigned to USAF Medical Center Keesler, Biloxi, MS |
| 1988 | Attended the School of Aerospace Medicine, Brooks AFB, TX |
| 1987 | Commissioned 2nd Lieutenant, U.S. Air Force Reserve |
| | Attended Officer Indoctrination School, Lackland AFB, TX |
| | Distinguished by election to both Honor Flight and Honor Squadron |

## PROFESSIONAL HONORS / AWARDS:

| | |
|---|---|
| July 2010 | Special consultant to the US Navy; *Confronting Irregular Challenges in the Maritime Environment* United States Naval War College, Newport, Rhode Island; July 27-30, 2010. |
| May 2008 | Invited to be the *Commencement Speaker* for the May 2008 graduating class of Delta College in Covington, Louisiana. |
| November 2007 | Selected as an "Everyday Hero" by the Sirius Radio *Catholic Channel*, *Seize the Day* with host Gus Lloyd. |
| October 2007 | Invited as the *2007-08 Guest Lecturer* for the Larry A. Jackson Lecture Series, an annual event at Lander University, Greenwood, SC. |
| September 2007 | Invited to be the *Commencement Speaker* for the September 2007 graduating class of Delta College in Covington, Louisiana. |
| August 2007 | *No Ordinary Heroes* made the local bestsellers list after the very first week of release (*DMA Bestsellers List*, Nielsen and Booksmart). |
| June 2007 | Chosen as one of six authors to represent Kensington Publications at the annual *Book Expo America* in New York City. |
| February 2007 | Presented with a *Commendation Medal*, the highest honor bestowed by the Orleans Parish Criminal Sheriff's Office, for *Outstanding Service to the Citizens of Orleans Parish* for "outstanding leadership and courage" during and after Hurricane Katrina. |
| November 2006 | Invited to be the *Key Note Speaker* at the Maryland Correctional Administrators Association (MCAA) annual meeting; Ocean City, MD. |
| August 2006 | Selected as one of seven first responders to be recognized at the *Prayer Breakfast for First Responders*. The meeting honored OPCSO staff, New Orleans Police Department officers, New Orleans firefighters, and city EMS personnel who served as first responders during Hurricane Katrina and its aftermath. |
| August 2006 | Chosen from city law enforcement officers and emergency services personnel by the *Historic New Orleans Collection* to be part of a perpetual museum exhibit documenting the actions of first responders during Hurricane Katrina. An audio recording of each responder's actions remains on permanent display in the museum. |
| January 2004 | Presented with a *Certificate of Merit* from Mayor Ray Nagin for *Outstanding and Dedicated Service to the Orleans Parish Criminal Sheriff's Office*. |
| July 2004 | Recognized by the National Commission on Correctional Health Care (NCCHC) for excellence in correctional medicine, designing a jail medical department which delivered exceptional medical care at reduced cost. |

| | |
|---|---|
| July 2003 | Recognized by the U.S. Department of Justice (in conjunction with the Federal Bureau of Prisons, the U.S. Marshals Service, and the Immigration and Naturalization Service) following a facility inspection ["Conditions of Confinement Review (CCR)"] for excellence in inmate health care; the OPSCO Medical Department ranked 1st out of the 41 facilities audited. |
| September 1998 | Awarded the *Air Force Achievement Medal* for an *Act of Courage* while serving at the 89th Medical Group, Andrews AFB, MD. |
| September 1996 | Awarded the *Air Force Commendation Medal* for *Meritorious Service* as Chief of Medical Services Flight and Chief of Internal Medicine at the 51st Medical Group, Osan Air Base, Korea. |

## PROFESSIONAL LICENSURE:

Medicine and Surgery, State of Louisiana
    June 1999 - present    License no. L#13023R

Medicine and Surgery, Commonwealth of Pennsylvania
    May 1995 - Dec.2003 License no. MD-055529-L

## PROFESSIONAL CERTIFICATION / AFFILIATION:

Delta College Institutional/Occupational Program Advisory committee, Honorary Member
    August 2007 - present
Supervising Physician Certificate, registered as a supervising physician for physician assistants
    May 2004
Society of Correctional Physicians, Member
    March 2004
AIDS Planning Counsel, Corrections Subcommittee, Member
    September 2002 – December 2004
American College of Physicians, Member
    June 1998    Membership no. 1032141
Fundamental Critical Care Support Certification, Society of Critical Care Medicine
    Dec. 1997
Diplomat in Internal Medicine, American Board of Internal Medicine
    Aug. 1996    Certificate no. 166076
Diplomat, National Board of Medical Examiners
    July 1993    Certificate no. 423076
Advanced Cardiac Life Support Instructor/Provider
ACLS Affiliate Faculty (while at Malcolm Grow Medical Center)
Basic Life Support Instructor/Provider

## PRESENTATIONS:

*The Challenges of a Career in Medicine*; guest lecturer, *Introduction to Clinical Medicine* seminar series; Tulane University, New Orleans LA; October 2011

*Correctional Medicine*; guest lecturer, "Foundations in Medicine" course, Tulane University School of Medicine New Orleans LA; August 2011

*The Challenges of a Career in Medicine*; guest lecturer, *Introduction to Clinical Medicine* seminar series; Tulane University, New Orleans LA; October 2010

*The Unique Challenges of Correctional Medicine*; guest lecturer, "Foundations in Medicine" course, Tulane University School of Medicine New Orleans LA; August 2010

*Looking Toward the Future*; guest speaker, Tulane University School of Medicine graduation/military promotion ceremony; Tulane University, New Orleans LA; May 2009

*The Challenges of a Career in Medicine*; guest lecturer, *Introduction to Clinical Medicine* seminar series; Tulane University, New Orleans LA; October 2009

*The Challenges of a Career in Medicine*; guest lecturer, *Introduction to Clinical Medicine* seminar series; Tulane University, New Orleans LA; October 2008

*Antiretroviral Drug Interactions*; guest speaker; educational program for community HIV providers sponsored by the LA Office of Public Health and Abbott Laboratories; Bogalusa, LA; July 2008

*A New Day Has Begun:  Excellence and Commitment in Health Care*; commencement speaker; Delta College commencement; Covington, LA; May 2008

*Leadership Under Fire*; a group discussion with political science students from the University of Pennsylvania; *No Ordinary Heroes* was required reading for the undergraduate course PS 298, *Leadership in Democracy*.  I met with the students to discuss the challenges I faced leading the jail Medical Department during the crisis of Hurricane Katrina and the subsequent recovery of New Orleans.  March 2008

*Hurricane Katrina and the Orleans Parish Jail*; guest speaker; Coquina Recreation Center, Elkton, FL; January 2008

*Disaster Preparedness – Lessons Learned from Katrina*; guest speaker; USCG Air Station, Belle Chase Louisiana; December 2007

*Making the Difficult Decisions*; guest lecturer, *Introduction to Clinical Medicine* seminar series; Tulane University, New Orleans LA; October 2007

*Hurricane Katrina and the Orleans Parish Jail*; guest speaker, Larry A. Jackson Lecture Series; Lander University, Greenwood SC; October 2007

*A Career in Medicine:  Dedication and Commitment*; commencement speaker; Delta College commencement; Covington, LA; September 2007

Book Reading and Discussion, *No Ordinary Heroes*; Driscoll Antiques, New Orleans, LA; August 2007

Book Reading and Discussion, *No Ordinary Heroes*; Barnes and Noble; Metairie, LA; August 2007

Book Reading and Discussion, *No Ordinary Heroes*; Barnes and Noble; Mandeville, LA; August 2007

Book Reading and Discussion, *No Ordinary Heroes*; Octavia Books; New Orleans, LA; August 2007

*Disaster Preparedness and Response, Lessons Learned from Katrina*; guest speaker; Louisiana Sheriff's Association Annual Meeting; Lafayette, LA; March 2007

*Disaster Preparedness and Response, Lessons Learned from Katrina*; keynote speaker; Maryland Correctional Administrators Association – annual meeting; Ocean City, MD; November 2006

*Important Infections in the Correctional Environment*; guest speaker, Louisiana Sheriff's Association Annual Meeting, Lafayette, LA; March 2006

*Correctional Health Care*; Tulane Medical School, *Foundations in Medicine* course; Faculty lecturer, New Orleans, LA; Delivered bimonthly, Jan 2002 – May 2005

*Advanced Cardiac Care: Physiology, Dysrhythmias, and ACLS Interventions*; Three day comprehensive review; New Orleans, LA; Sole instructor for this 20-hour course; October 2004

*Correctional Health Care: Challenges and Obstacles to Care*; Tulane Medical School, Grand Rounds; New Orleans, LA; October 2003

*HIV: Virology, Epidemiology, Natural History, and Treatment*; OPCSO mini-fellowship, New Orleans, LA; Sole instructor for this three day (32 hour) course; September 2003

Quality *Improvement in Correctional Medicine*; guest lecturer; UTMB HIV mini-fellowship; Galveston, TX; April, 2003

*Advanced Cardiac Care: Physiology, Dysrhythmias, and ACLS Interventions*; Three day comprehensive review; Malcolm Grow USAF Medical Center; Andrews AFB, MD; Sole instructor for this 20-hour course; February 1999

*Renal Anatomy, Physiology, and Pathophysiology* and *Endocrine Disorders*; Critical Care Course; Malcolm Grow USAF Medical Center; Andrews AFB, MD; Course instructor; October 1998

*Advanced Cardiac Care: Physiology, Dysrhythmias, and ACLS Interventions*; Three day comprehensive review; Malcolm Grow USAF Medical Center; Andrews AFB, MD; Sole instructor for this 20-hour course; August 1998

*Srub Typhus: An illness presenting with a wide clinical spectrum in U.S. personnel*; Grand Rounds, Malcolm Grow USAF Medical Center Grand Rounds; Andrews AFB, MD; July 1997

*Advanced Cardiac Care: Physiology, Dysrhythmias, and ACLS Interventions*; Three day
   comprehensive review; Malcolm Grow USAF Medical Center, Andrews AFB, MD;
   Sole instructor for this 20-hour course; February 1997

*Advanced Cardiac Care: Physiology, Dysrhythmias, and ACLS Interventions*; Three day
   comprehensive review; 51st Medical Group, Osan Air Base; Korea; One of two instructors for
   this 20-hour course; April 1996

*Recognition and Treatment of Life Threatening Dysrhythmias*; Grand Rounds, 121st Army
   Hospital, Yongsan Army Garrison, ROK; Jan. 1996

*The Evaluation and Treatment of Hyperthyroidism*; Professional Staff Meeting, 51st Medical
   Group, ROK; Nov. 1995

*EMT Basic Course*; Two week training program to certify new EMTs; 51st Medical Group,
   Osan Air Base, Korea; Course instructor; December 1995

*Advanced Cardiac Care: Physiology, Dysrhythmias, and ACLS Interventions*; Three day
   comprehensive review; 51st Medical Group, Osan Air Base, Korea; One of two instructors for
   this 20-hour course; October 1995

*Chronic Diarrhea*; Grand Rounds, Eglin USAF Medical Center, Pensacola, FL;
   Feb. 1995

*Chronic Diarrhea*; Grand Rounds, Keesler Medical Center, Keesler AFB, MS;
   Dec. 1994

*A case of Erythema Induratum Resolved with Antimicrobial Therapy*; Keesler Medical
   Center, Keesler AFB, MS; Oct. 1994

## PUBLIC RELATIONS / MEDIA APPEARANCES:

### Job-Related:

WWL-radio (The Spud McConnell Show), live radio call-in show; interviewed along
   with Sheriff Jack Strain (STPSO) regarding the deficiencies in psychiatric
   services in the state and the consequences for local jails (emphasis on actively
   suicidal inmates); 7/2/10

*Times-Picayune*, *St. Tammany Parish Metro Section*; coverage of a press conference
   where Sheriff Jack Strain (STPSO) and I discussed problems with mental health
   Services in the parish and their impact on the jail and local community; 8/07

WGNO-TV, News; interviewed with Sheriff Jack Strain (STPSO) regarding the lack of
   psychiatric services in the parish post-Katrina and the increase in mental illness
   among arrestees and inmates of the St. Tammany Parish Jail; 8/07

WWL-radio, live radio call-in show; interviewed along with Sheriff Jack Strain
   (STPSO) regarding the lack of psychiatric services in the parish post-Katrina and
   the increase in mental illness among inmates at the Jail; 6/07

BBC Documentary, *Prisoners of Katrina*; filmed a segment discussing the problems
   faced by the Orleans Parish Jail staff during and after Hurricane Katrina; 5/06

14

*New Orleans City Business*, *Orleans Parish Prison Doctor Recounts Heroic Experience*; interview 4/3/06
*New Orleans City Business*, *Caught off guard*; cover story 3/27/06
Press conference, multimedia-TV, radio, and newspaper; discussed a recent death at the jail and tuberculosis screening and treatment policies at the facility; 3/05
*Correct Care: A Publication of the National Commission on Correctional Health Care*, *New Orleans Jail Attains the Holy Grail*, NCCHC focus on healthcare at OPCSO; Volume 18, Issue 3, Summer 2004
Televised commercials; appeared in several television spots recruiting nurses for the Orleans Parish Jail's Medical Department; aired on several stations from 2/02 to 10/03
NOaccessTV (local cable access channel), *Public Safety with Sheriff Foti*; discussed the opening of the Orleans Parish Jail's new psychiatric building, Templeman 5; 10/03
*Gambit Weekly*, New Orleans, LA, *Letters to the Editor*; 2/4/03
NOaccessTV (local cable access channel), *Public Safety with Sheriff Foti*; discussed improvements in medical care at the jail (OPCSO); 11/02
Press conference, multimedia-TV, radio, and newspaper, discussed a recent death at the jail (OPCSO); 8/01

**Book-Related, *No Ordinary Heroes*:**

National Publicity
    KDKA-AM, *The Morning News;* live interview 9/1/08
    Sirius Satellite/Catholic Channel, *Seize the Day*; live 11/26/07
    Sirius Satellite/Catholic Channel, *As You Think*; live 8/29/07
    USA Radio Network, *Daybreak USA*; aired on 130 stations; live 8/29/07
    Metro Networks News,2000 plus affiliate stations; interview taped 8/27/07
    Bloomberg Radio, *Weekend Muse*; aired on 750 stations & Sirius Satellite Radio; interview 8/25/07
    Go.Left,TV, *thealtreport,* internet
    PopMatters.com, RE: PRINT, the popmatters book blog, *Stories from Katrina*, 8/25/07
    *Southern Mom: life deep-fried and tasty*, blog, *Halle Berry is my Mama*; posted 8/25/07; http://soulprncs2.wordpress.com/

Print
    *WHERE Y'AT*, New Orleans, LA; book review 11/24/07 (December 2007 issue)
    *Index Journal*, Greenwood, SC, *Author tells how storm affected jail in Louisiana*; feature article 10/5/07
    *Index Journal*, Greenwood, SC, *Doctor to detail post-Katrina survival,* service; feature article 9/26/07
    *Lander In the News*, Lander University, Greenville, SC; *After Katrina – Prison doctor to detail survival, service in New Orleans prison*; feature article 9/25/07

*Pittsburgh Tribune-Review*, Pittsburgh, PA, *Eye in the storm*; feature article 9/23/07 (also featured in the *Greensburg Tribune Review*, the *Valley News Dispatch*, and several other newspapers belonging to the "Trib Family".)

*Advance Leader*, Plum, PA, *Inglese book describes efforts in hurricane-blasted prison*, feature article 9/12/07

*St. Augustine Record*, St. Augustine, FL, *Doctor's book highlights hurricane horrors*; article with review 8/31/07; posted to staugustine.com

*Murrysville Star*, Murrysville, PA, *FR alumnus pens book on Katrina effort*; feature article 8/29/07

*The Ambush*, bimonthly periodical serving the TX, LA, MS, AL gulf coast; review 8/28/07; also posted to AmbushMag.com.

*Penn-Franklin News*, Murrysville, PA, *Franklin grad authors book on experiences during Hurricane Katrina*; feature article 8/27/07

*Penn Trafford News*, Penn Trafford and Harrison City, PA, *Franklin grad authors book on experiences during Hurricane Katrina*; feature article 8/27/07

*Delmont Salem News*, Delmont and Greensburg, PA; review 8/27/07

*Press Register*, Mobile, AL, *Two years later, new books on Katrina abound*; this review of all the Katrina literature specifically highlights and recommends *No Ordinary Heroes*; 8/25/07; posted to al.com

*Gambit Weekly*, New Orleans, LA, *Medical Intervention*; feature article 8/14/07

*Index Journal*, Greenwood, SC, *Doctor's writing highlights Hurricane Katrina horrors*; feature article 8/19/07

*The Oklahoman*, Oklahoma City, OK; listed in Book Section and included on NewsOk.com 8/19/07

*Star Beacon*, Ninety Six, SC, *Area couple's doctor son writes about Katrina*; Feature article 8/15/07

*New Orleans Times-Picayune*; review 8/5/07

*Asbury Park Press*, New Jersey, *Shelf Life*; mention 8/5/07

*Herald-Tribune*, Sarasota, FL, *New Books*; mention 8/5/07

*The Daily Advertiser*, Lafayette, LA, *Louisiana Book News*; column 8/5/07

*The Octavian*, New Orleans, LA; listing and book description; 8/1/07

*Deseret Morning News*, Salt Lake City; review 7/27/07

*New Orleans City Business*, *Why Stay?*; feature article 7/9/07

*New Orleans Times-Picayune*, *The Essential Hurricane Katrina Nonfiction List*; listing 7/8/07

*Kirkus Reviews*; starred review 6/15/07

*Publishers Weekly*; review 5/28/07

Postings

coqinadaily.blospot.com, event listing, 1/8/08

nolablogger@blogspot.com

savannahnow.com (links to NOLA posting of *Times-Picayune* Review)

NOLAblogger.com (Times-Picayune "*Essential Hurricane…*" listing, 8/8/07

NOLA.com (*Times-Picayune* review)

NOLA.com, *Hell and Heroes in the OPP*, 20 minute audio/video with written article; 8/28/07; also posted to blob.nola.com/bourbon (*Bourbon Street Journal)* and to coqinadaily.blogspot.com (Elkton, FL)

altweekly.com (links to *Gambit* article)
Amazon.com; book description along with editorial and reader reviews; 8/1/07
barnesandnoble.com; book description along with editorial and reader reviews; 7/31/07

Local New Orleans Media

WRNO-FM, *The Jim Brown Show*; live interview 10/8/07
WGNO-TV, *ABC26 This Week*; taped interview, aired 9/9/07; (available at ABC26.com)
WGSO-AM, the *Bernie Cyrus Show*; live radio call-in show 9/3/07
*WYLD-FM, Sunday Journal*; live interview 9/2/07
NOLA.com; taped video/audio interview posted with a written review; 8/29/07
WGNO-TV, *The 411*; taped interview, aired 8/26
*Gambit Weekly*, review 8/15/07
WWL-TV, *Morning News*; live interview 8/15/07
WIST-AM, *Shane Warner Show*; live interview 8/14/07
WWL-TV, *Sunday Morning*; taped interview, aired 8/12/07
WWL-AM, *The Spud Show*; live interview 8/8/07
WRNO-FM, *The Jim Brown Show*; live interview 8/7/07
*New Orleans Times-Picayune*; review, 8/5/07

Local Radio (outside New Orleans)

| | |
|---|---|
| Baton Rouge, LA | WJBO-AM, News; live 8/28/07 |
| Bridgeport, CT: | WICC-AM, *David Smith's Exchange*; live 8/13/07 |
| Kansas City, MO: | KULH-FM, *The Wave Wake Up Call*; taped 8/6/07 |

Book Signings

Lander University, Greenwood, SC, 10/4/07
Driscoll Antiques, Oak Street, New Orleans, LA (Maple Street Book Shop sponsoring event); 8/25/07
Barnes & Noble, 3721 Veterans Memorial Blvd. Metairie, LA 70002; 8/18/07
Barnes & Noble, 3414 Highway 190, Suite 10, Mandeville, LA 70470; 8/11/07
Octavia Books, 513 Octavia Street, New Orleans, LA 70115; 8/7/07
Book Expo America (BEA), New York, NY; 6/2/07

Event Listings

NOLAFunGuide.com
BestofNewOrleans.com
2theadvocate.com; 8/5 and 8/12/07
*New Orleans Times-Picayune, Saturday Calendar*; 8/18/07

**ABSTRACTS:**

Inglese RD, Gasser RA Jr. Scrub Typhus: an illness presenting with a wide clinical spectrum in U.S. personnel. Society of Air Force Physicians (Air Force Region, American College of Physicians), Dayton, OH, March 1997.

Inglese RD, Sitton BJ. A case of erythema induratum resolved with antimicrobial therapy. Southern Medical Association, Orlando, FL, November 1994.


**RESEARCH EXPERIENCE:**

University of Pennsylvania Medical Center, Philadelphia, PA
The Institute for Environmental Medicine
Full-time: Aug. 1988 - Aug. 1989;  Part-time: Aug. 1989 - May 1992
Investigated oxygen toxicity in man and animals, and the isobaric counterdiffusion of inert gases.

Case Western Reserve University, Cleveland, OH
Department of Developmental Genetics and Anatomy, Aug. 1985 - May 1986
Investigated the interaction of mRNA with the cytoskeleton of HeLa cells.

Department of Pathology, Aug. 1985 - Dec. 1985
Studied the structure and solubility of the paired helical filaments which exist within the neurofibrillary tangles of Alzheimer's disease.

To:         Mr. Charles Hughes
            Talley, Anthony, Hughes, and Knight

From:       R. Demaree Inglese.

Date:       January 04, 2012

Subject:    Inmate Timothy Murray (DOB 06/20/79)

Mr. Hughes,

I would like to respond to the allegations raised in the *pro se* suit filed by Mr. Timothy Murray pertaining to his medical care at the St. Tammany Parish Jail. The first allegation involves the care provided to Mr. Murray following his escape and subsequent apprehension in June of 2009. In his complaint, Mr. Murray alleged that his civil rights were violated because he was denied adequate medical care after being brought back into the jail. He also alleged that the care he received was inappropriately delayed.

Health staff were first notified of Mr. Murray's capture at 0230 hours on June 21, 2009. Licensed nurses are on site at the jail 24 hours a day, seven days a week, and a nurse immediately responded to evaluate Mr. Murray. In fact, the nurse examined Mr. Murray while he was still in "washdown", before he was even dressed out or placed into a cell.

Mr. Murray had stable vital signs and was in no serious distress. He had several contusions on his head and had "multiple abrasions, insect bites, and minor lacerations" on his torso. In addition, he had several small lacerations and dog bites to his extremities. Finally, Mr. Murray had a laceration with "moderate bleeding" on his upper lip. (Please see the 6/21/09 *Nurse's Note* from 0230 hours.) The nurse cleaned and bandaged Mr. Murray's wounds and applied "steri-strips" to his lip laceration. She also provided an ice pack for Mr. Murray's face. Then, the nurse contacted the on-call physician, Dr. Bhatt, for additional instructions.

Dr. Bhatt was called at 0240 and gave orders for pain killers (Ultram) and daily wound care. The doctor also ordered that Mr. Murray be evaluated by the jail physician later that day in sick call.

1

Dr. Dileo, a staff physician and internist, evaluated Mr. Murray in the medical clinic later that morning as ordered (1030 hours on June 21st). Dr. Dileo noted a "through-and-through laceration of Mr. Murrays's mid upper lip. He surgically repaired the laceration without complications. Following the repair, Dr. Dileo prescribed additional analgesics (pain medications) and antibiotics (to treat the lip injury and also to help prevent infection of Mr. Murray's dog bites). Dr. Dileo also ordered continuation of daily wound care, and he scheduled a follow-up doctor's appointment for three days later.

Nurses administered the antibiotics and pain killers as ordered and provided daily wound care to Mr. Murray's injuries. In addition, on June 22nd, physicians ordered an x-ray of Mr. Murray's nose. (The x-ray was performed, and there was no fracture.) On June 24th, Mr. Murray was seen back in sick call for a formal wound check as ordered. His injuries did not appear infected, and his therapy continued unchanged. Mr. Murray was seen in sick call again on June 25th for another wound check. His injuries were improving.

On June 26, 2009, Dr. Gary French did an extensive follow-up examination of Mr. Murray. He thoroughly examined Mr. Murray's extremities to ensure there was no infection from the canine bites. Dr. French did not appreciate any infection, and he did not change Mr. Murray's treatment.

Jail health staff continued treating Mr. Murray with antibiotics, pain killers, and wound care for the next few weeks. His injuries healed without complication. Prescribed medications were administered as ordered, and all follow-up appointments were kept.

The above facts show that Mr. Murray's allegations about receiving suboptimal care after his apprehension are completely unfounded. Nurses responded to Mr. Murray as soon as they were notified of his arrival. Mr. Murray was completely stable and did not need to go to an emergency room. A physician was consulted immediately for orders, and those orders were carried out without exception. Finally, Mr. Murray was seen by a licensed physician 8 hours later, and the one wound that required sutures was surgically closed without complications. (Of note, 8 hours is certainly a reasonable time frame to suture a lip laceration. A patient would wait far longer for a few stitches if he/she presented to the Charity ER on a busy night at 2:30 in the morning.)

In the weeks that followed Mr. Murray's capture, jail health staff continued providing him with excellent care. He received appropriate antibiotics, analgesics, and wound care, and *all of his injuries healed without sequelae*. Mr. Murray's care post-capture met all applicable standards of medical care in terms of both quality *and timeliness*. Moreover, Mr. Murray healed completely and, thus, sustained no damages from his medical treatment or any alleged lack thereof.

The second medical issue raised in Mr. Murray's complaint alleges that jail medical staff refused to provide him with proper medical care as retribution for his escape. This allegation is again untrue. Mr. Murray was seen each and every time he completed a sick call request for medical attention. Moreover, he experienced the exact same waiting times as every other inmate housed in the St. Tammany Parish Jail. (In 2009 - 2010, the typical waiting time for a non-emergent medical problem was 2 to 4 days. This waiting time was far shorter than the waits experienced by unincarcerated individuals in the local community.) Furthermore, Mr. Murray was seen by health staff *daily* (seven days a week) the entire time he was in isolation. Thus, Mr. Murray had excellent access to care. Finally, during his incarceration, Mr. Murray was referred for off-site specialty care on numerous occasions. In short, Mr. Murray received excellent care at the St. Tammany Parish Jail, care superior to that available to most local citizens of the parish.

Next, I'd like to discuss the incident from May 16, 2010, where Mr. Murray alleges to have slipped on a shower drain. At 2150 hours on May 16th, Mr. Murray called a medical emergency. Nurses responded immediately and found him lying on his back. Mr. Murray informed the nurses that he'd fallen and hurt his lower back. Mr. Murray was alert and oriented, and he denied any loss of consciousness. However, he refused to move his legs, claiming that his back hurt too bad to do so. Mr. Murray's vital signs were stable, and he was able to move both feet, but he absolutely refused to move his legs, sit, or stand. In fact, he was extremely belligerent with the nurses, yelling and cursing at them and demanding to be taken to a hospital.

The nurses called the on-call physician, Dr. Marcus Dileo, for orders. Mr. Murray was well known to Dr. Dileo as the physician had treated Mr. Murray on numerous occasions. The nurses explained that Mr. Murray appeared stable and had stable vital signs but was refusing to move or cooperate, demanding transfer to a hospital. Dr. Dileo knew that Mr. Murray was an escape risk, and did not perceive any urgent medical situation. Consequently, Dr. Dileo drove from his home in Metairie to the jail to personally evaluate Mr. Murray.

[Of note, Mr. Murray claims that health staff failed to provide him with proper medical attention. However, this was the *only time*- in seven years- that Dr. Dileo has driven back to the jail to examine a patient at night. He wanted to ensure that Mr. Murray received adequate care without exposing deputies or hospital staff to undue risk.]

Dr. Dileo arrived at the jail at approximately 2228. He immediately went to Mr. Murray's side and performed a neurologic examination which was normal ("intact"). Dr. Dileo then assisted Mr. Murray into a wheelchair; Mr. Murray was able to get up and into the chair, despite his earlier claim of not being able to move.

Mr. Murray was taken to the jail medical clinic for further observation and was given ibuprofen.  Later (2300 hours), the nurses noted Mr. Murray lying on his side, resting curled up in a ball- a position that would be difficult for a patient with a significant back injury.  Mr. Murray slept through the night without further complaint.

At approximately 0630, Mr. Murray requested a breakfast food tray from the nurse.  At the time, he also reported "severe" back pain.  Later, at 0830, he was escorted to another cell in the medical clinic.  Mr. Murray insisted he could not walk, and nurses were forced to use a wheelchair to move him.  However, later (1130), Mr. Murray was observed getting out of bed and coming to the hatch to get a lunch tray from the trustee.  He had no difficulty getting up, walking to the door, or bending over to get his tray- despite claims of not being able to walk.

At 1530, Mr. Murray was reexamined by health staff.  He was not in any apparent distress, and he moved all extremities with good range of motion.  Mr. Murray was able to walk without help and get into and out of his wheelchair unassisted.  Furthermore, the nurses had previously observed Mr. Murray walking to and getting on/off the commode without help.  Despite this, Mr. Murray continued to insist that he couldn't walk to the hatch and that he was in severe pain.  Nurses measured his vital signs and found that Mr. Murray's pulse was only 62 beats per minute.  This slow heart rate was not consistent with a patient in significant pain.  (Disabling pain would surely elevate one's pulse.)

Mr. Murray remained in a medical holding cell for observation.  At 1935, a nurse observed that Mr. Murray was animated, sitting on the floor of his cell, "talking to everyone who walks by his cell."  In fact, he was laughing and joking with Corporal Helback.  Captain Joe Way was made aware of the situation, and felt that Mr. Murray- who posed a significant danger to jail staff- should be returned to his own cell if he did not have pressing medical problems.

The nurse on duty called me at home at 2026.  She apprised me of the situation, and I ordered that Mr. Murray be returned to his isolation cell.   Mr. Murray had been examined by Dr. Dileo, and no neurologic problem was discovered.  He had no marks or bruises on his body from his alleged fall.  His pulse was only 62 beats per minute which was not consistent with a patient in severe pain.  He repeatedly walked and bent over, despite claiming to be unable to move.  Finally, he was sitting on the floor conversing and joking with others.   There was absolutely no indication that Mr. Murray had experienced any significant injury.

4

My decision to return Mr. Murray to his cell had nothing to do with reprisal for his escape. The clinical scenario simply did not warrant further intervention. My decision was undoubtedly the correct one. Mr. Murray was able to walk the whole way back to his cell without difficulty. Furthermore, he never again complained of back pain or submitted a sick call request, reporting back problems. His claim that he was paralyzed and unable to move his legs or walk was completely fallacious. (Mr. Murray filed an *Inmate Complaint* about this May 16th incident while he was incarcerated at the St. Tammany Jail. Please see my extensive response to that complaint for additional details.)

One final aspect of this incident must be emphasized. Mr. Murray claims that jail medical staff did not provide him with quality health care. However, Dr. Dileo drove in to see Mr. Murray on the night of May 16th, rather than having him wait until the next morning's sick call. This action shows just how committed jail health staff were to providing Mr. Murray with excellent medical care.

There are several additional issues which must be considered when evaluating Mr. Murray's care at the jail. First, he was a very noncompliant patient. He frequently disregarded provider's instructions, and he was noncompliant with his prescribed medications. As an example, on 6/20/10, Mr. Murray's Tylenol was discontinued. This was not indifference to Mr. Murray's needs or retribution in any way. Mr. Murray's cell was searched on that date. Deputies discovered *114 Tylenol tablets* hidden in his belongings. Mr. Murray had not been taking his prescribed pain medication; thus, it was entirely reasonable to discontinue the medication. (Of note, this was only 4 days after Mr. Murray's alleged fall and supposedly debilitating pain, yet he was not taking his analgesic medication.)

There is another excellent example of Mr. Murray's extreme medical noncompliance. In October of 2007, Mr. Murray complained of left shoulder pain. He was seen for this on several occasions and given a sling, analgesics, anti-inflammatory medications, and therapeutic exercises. (Of note, Mr. Murray was caught abusing his medications on several occasions.) Mr. Murray continued to complain of pain, so Dr. French ordered x-rays and additional follow-up. When Mr. Murray failed to improve, Dr. French referred him the Orthopedic Clinic at the Medical Center of Louisiana (MCL) for specialty consultation.

Mr. Murray was taken to that appointment, and the orthopedic surgeon ordered an extensive work-up, including x-rays and an MRI. Mr. Murray was taken for the designated studies and for return appointments. The orthopedic surgeon ultimately concluded that Mr. Murray had a "left anterior labral (rotator cuff) tear and a Hill-sacks lesion". The surgeon felt that operative intervention would be necessary to correct the problem.

To be clear, this was an *elective* repair that did not have to be done immediately. Most jails do not approve elective procedures such as hernia repairs, circumcisions, or rotator cuff repairs. They hold such procedures until inmates roll out or transfer to state prison facilities. In Mr. Murray's case, we agreed to allow the surgery because we felt that he was likely to be incarcerated for a lengthy period of time, and we wished to relieve his discomfort as soon as possible.

Mr. Murray underwent his surgery in April of 2008, and the procedure went well, without any complications. Mr. Murray was taken back for his follow up appointments as requested, and jail physicians followed the recommendations made by the orthopedic surgeons. With this care, Mr. Murray did quite well and was healing as expected. Then, on November 6, 2008, he presented back to the medical clinic complaining of new left shoulder pain. Dr. French reevaluated Mr. Murray and discovered that he'd been doing pulls ups when he felt his shoulder tear.

Dr. French had repeatedly instructed Mr. Murray about his physical therapy and had specifically told him *not* to do vigorous exercises like pull ups until cleared by orthopedic surgery. Mr. Murray had ignored Dr. French's instructions and, as a result, had torn out his shoulder repair.

We referred Mr. Murray back to the surgeon for reassessment, and work-up was underway at the time of Mr. Murray's escape. After Mr. Mr. Murray was apprehended, we cancelled his scheduled MRI because he was considered too high a security risk to undergo a second *elective* repair. However, when it appeared that Mr. Murray would be staying at the jail for an extended period, I personally authorized referral back to orthopedic surgery, despite the reservations of security personnel. Return appointments were requested as documented in the medical record. However, Mr. Murray left the jail before his appointments occurred.

This example illustrates well just how committed jail health staff was to caring for Mr. Murray. We scheduled an elective surgery for him when most jails would not. We even requested a second *electi*ve surgery, despite Mr. Murray's escape and the potential risk of transporting him out of the jail environment. This example also shows how Mr. Murray's noncompliance (noncompliance with medications and noncompliance with physical therapy) compromised his care. However, there was never a time when jail physicians withheld care or provided suboptimal care out of retribution for Mr. Murray's escape.

There is one more issue which must be considered when examining Mr. Murray's medical care at the St. Tammany Jail. He was extremely rude and insulting to the medical staff. Mr. Murray would routinely yell and curse at both nurses and physicians. He regularly referred to Dr. Dileo as "Doctor Dildo"- in front of Dr. Dileo, staff nurses, and other inmates. In addition, on multiple occasions, he made derogatory comments to a gay physician, calling him "faggot", time and again, in the middle of the clinic. In fact, whenever physicians would go into an office and shut the door, Mr. Murray would loudly proclaim that they were "doing homosexual acts" in the office. This appalling behavior

6

is well documented in Mr. Murray's chart and in my responses to his *Inmate Complaints*. However, despite this callous, disrespectful behavior, jail health staff always provided Mr. Murray with quality medical care.  We responded each and every time he requested medical attention, and our treatment always met prevailing standards of good medical care.  There was never a time when Mr. Murray received substandard care because of his escape attempt or his atrocious treatment of our staff.

Finally, I can only identify one *Grievance* and three *Complaints* submitted by Mr. Murray during his entire incarceration.  The only *Grievance* and the first *Complaint* were submitted in June of 2008.  Both forms requested a second mattress due to pain from Mr. Murray's surgery.  These were submitted prior to his escape, and neither alleged improper medical care, only a need for a second mattress.

Mr. Murray submitted a second *Complaint* in December of 2009, alleging maltreatment by medical staff.  I investigated the complaint and found it without merit.  Then, I personally met with Mr. Murray to hear him out and to deliver my response.  During the encounter, I admonished Mr. Murray for his improper remarks, including his repeated harassment of Dr. French for his sexual orientation.

Mr. Murray's final *Inmate Complaint* was submitted in late May of 2010.  That complaint concerned the alleged fall on May 16, 2010.  I responded to the complaint in a timely fashion and met with Mr. Murray again.  Once more, I determined that his allegations were unfounded, and, once again, I admonished Mr. Murray for abusing the medical staff.  I have attached both *Complaints,* and my responses, to this letter for reference.

In summary, Mr. Murray received excellent medical care during his incarceration at the St. Tammany Jail.  The medical treatment provided after his apprehension on June 21, 2009, was thorough and timely, meeting accepted standards of care.  Moreover, the care was clearly sufficient as Mr. Murray did not suffer any negative outcome from the treatment he received.  Additionally, there is absolutely no basis to the allegation that jail physicians withheld care from Mr. Murray on May 16, 2010, or at any other time during his incarceration as a reprisal for his escape attempt.  Jail physicians did their best to care for this very difficult patient despite his repeated verbal abuse and his medical noncompliance.  Finally, Mr. Murray did not pursue the official ARP procedure as outlined in the Inmate Rule Book.  He did not file one single *Grievance* after June of 2008.

This concludes my response to the claim filed by Mr. Timothy Murray.  Please feel free to contact me if you have any questions or require further information.

Sincerely,

R. Demaree Inglese, M.D.
Medical Director, STPSO

C-200-134

## RESPONSE TO INMATE COMPLAINTS

| | |
|---|---|
| Inmate Name: | Murray, Timothy |
| Booking Number: | 141419 |
| Housing Assignment: | A78 |
| | |
| DATE OF INCIDENT: | N/A |
| TIME OF INCIDENT: | N/A |
| PLACE OF INCIDENT: | N/A |

### RESPONSE

You are seen quite frequently in medical. On every occasion, the staff on duty reports that you are grossly inappropriate. You regularly demonstrate belligerant behavior and aggressive comments/actions. Moreover, you REPEATEDLY make inappropriate comments regarding the physician staff. You saw Dr. Dileo on 12/06/09. While sitting on the bench in medical, he heard you make several remarks discussing how the physicians shut themselves in Dr. French's office and participate in homosexual acts. You also saw Dr. French on 12/02/09. He, likewise, reported that he overheard you making inappropriate comments (that time regarding Sheriff Strain). I questioned both providers about the allegations you made in your complaints, and I also questioned the nurses on duty and the medical deputies as well. None substantiated your allegations. While I would never condone the inappropriate treatment of any inmate, I would suggest that you behave more appropriately if you desire to be treated with more respect.

| | |
|---|---|
| DATE RESPONDED TO: | 12/8/2009 |
| RANK WHO RESPONDED: | Dr. R. D. Inglese, Captain |

R. O. Inglese, MD
12/9/09

Recieved Timmy Murray
12/10/09

## INMATE COMPLAINT FORM

Timothy Murray _____     14/419 _____     A-28 _____
**Inmate's Name**          **Booking Number**   **Housing Assignment**

**DATE OF INCIDENT:** From 26/21/09 to Now

**TIME OF INCIDENT:** ON going

**PLACE OF INCIDENT:** Medical

## COMPLAINT

On December 3rd I went to the infirmary because of some type of pimples or nodules on my face, chest, and back. I saw Dr French who treated me with a miffy demeanor. I pointed out that one of the nodules on my face felt like it was turning into staff. However, the infection was not treated, yet I was treated with disdain. I was issued by Dr French "soap" that I told him I already had from the previous time I was at medical for this same problem, and it wasn't working.

I always recieve sullen remarks from Dr French which are dourine and insolent, deviating from what is usual and proper. I'm not sure when "Dr French" replaced the study of medicine with penology, and prescribing punitive penalties, but it's not professional at all coming from him as my doctor.

Aside from the deficiency of quality of maltreatment I recieve from doctor French he odiously made a snide comment that "They should blame my mother for my escape for giving birth to me." This unrestrained criticism proves an favorable prejudice towards me.

After the mortifying session of maltreatment, I was sent back to my cell to prescue without proper medication. On Friday I told Nurse Julie that the nodule had turned into staff. She said that she would tell doctor French, then I recieved recieved nothing, or heard nothing from medical.

On Friday Dec 4th at about midnight nurse Paula observed the turgid condition of the nodule on

12/25/09 _____          Timmy Murray _____ (over)
**Date Filed**            **Inmates' Signature**

y face and shoved Dr. Collins when prescribed me the antibiotics immediately.

Prior to my escape, I was taking 3 ultrams per day and 1 flexaril at night. These medicines were discontinued during the escape which was not restored during my return. After a couple of "Sick call" request I was finally prescribed 1 ultram per day. I've had futile promises of me seeing a Specialist, ~~it's been~~ about my shoulder, It's been 6 months now and still no sign of a Specialist.

Due to the lack of care and ~~inept~~ treatments and the likelyhood of reprisals, I must refuse any further treatment by Dr. French. It is ~~very easily~~ easily perceptible to anyone with good eye sight that there is ill-will and a personal dislike between Dr. French and myself. If it was not for his stubborness and neglect I would not be suffering with the degree of infection I have this very moment, which I am still awaiting treatment, which will be savry to my well-being.

I was not treated right for this sick-call, Dr. French gave me soap and motclens, which I told him I already had, and it wasn't working, I feel like the $10.00 I was charged for this visit should be ~~returned~~ refunded to my account sence I was improperly treated. Please look into this? If possible I would like to talk to you face to face about this.

Thank you

Tommy Murray

# INMATE COMPLAINT FORM

Timothy Murray _____ 141414 _____ A-78 _____
**Inmate's Name**     **Booking Number**     **Housing Assignment**

**DATE OF INCIDENT:** 12/06/09

**TIME OF INCIDENT:**

**PLACE OF INCIDENT:** Medical

## COMPLAINT

once again I am fighting staff infection which was allowed to manifest due to negligence of the medical department of this facility. After numerous verbal complaints to deputies and nurses alike, I was finally escorted to the infirmary. There I was seen by Dr. Dillio. During this visit I was highly insulted by the Doctor with a proper affront, which I wish to pursue this with imperious punition.

Since Thursday 12-03-09 Night I have been neglected in treatment of the said staff infection. While I was in medical today (12-06-09) Dr. Dillio squeezed the pus out of the infected sore. This was done in the waiting area of the medical department with traffic of other inmates and employees who were not sanitized or a insanitary envirement. Such as his office or any of the other rooms designated for treatment.

The Doctor gave me antibiotics and aspirin for pain. I asked him was that all he was going to do to give me and he responded whimsically "you're done" and I could go back to my cell. I mentioned to him that I was in obvious pain and asked if there was anything else that he may do or prescribe to help ease the pain. He repeated in the same rude monotone manner that "you're done".

I made the comment that I was aware that the denial of proper treatment was coming from above his head. He responded very unexpectedly _____ (over)

12/06/09 _____ Timothy Murray
**Date Filed**     **Inmate's Signature**

and unappropriately that "The only thing that was over his head was this, and clutched his phallus and said "in your mouth. Suggesting that I perform homosexual fellatio on him. I was astonished. This is the second encounter with a proffessional that I encounted. Now I am affraid to be treated any further by the staff employed by this medical department.

This should be treated for what it is — Not only an open blatant insult, but a full sexual assault. "as witnessed by 3 employees.

Deputy Craig, Deputy Comeoux, and Nurse Dorcey.

C-2010-254

## RESPONSE TO INMATE COMPLAINTS

| | |
|---|---|
| Inmate Name: | Murray, Timothy |
| Booking Number: | 141419 |
| Housing Assignment: | Isolation |
| | |
| DATE OF INCIDENT: | 5/16/2010 |
| TIME OF INCIDENT: | see below |
| PLACE OF INCIDENT: | see below |

### RESPONSE

I am aware of your fall on May 16, 2010 at approximately 2150. The jail nurses responded immediately and encountered you lying in the hallway, complaining of hurting your lower back. Moreover, you reported that you could not move your legs and refused to get into the wheelchair. You insisted that you could not move your legs, but you could move both feet. Dr. Dileo, the physician on call, was notified and decided to come to the jail to examine you. When he arrived you refused to cooperate and, according to both the phsyician and the nurses on duty, began swearing at them and threatening to sue the providers and the jail. (Of note, I myself have heard you threaten and curse Doctors Dileo and Dr. French in the past.) You were observed overnight and continued to report tremendous pain; however, your heart rate was only 62 beats per minute, certainly not indicative of any significant distress. Furthermore, the nurses observed you throughtout the next day, and they documented you walking without assistance, getting into and out of a chair alone,

| | |
|---|---|
| DATE RESPONDED TO: | 5/20/2010 |
| RANK WHO RESPONDED: | Dr. R.D. Inglese |

chair alone, squating at the hatch, acting "animated", and "laughing" with staff. Also, there was no bruising or exam evidence of any significant trauma. Dr. French performed an extensive evaluation on 5/18/10. He did not appreciate any significant injury. Your neurologic examination was entirely normal, and several of your reported complaints were non-physiologic.

I personally reviewed the film of your fall. You landed on your shoulder which took the full impact of the fall. You did not strike your back, and there is absolutely no reason why you could not have moved your legs on 5/16 or 5/17. You moved them fine the next day, and your examination was entirely normal on the 18th; there wasn't even any bruising at the impact site of muscle spasm in the back.

Your medical care was quite sufficient. Nurses reponded immediately, and a physician even drove to the jail at night just to evaluate you (a 50 minute drive). There is absoultly no evidence of any significant or persistent problem.

There is one issue which must be addressed at this time. Please see the reverse of this paper for continued explanation.   < Reverse >

I recieved a copy  Timmy Murray 5/25/10

Murray, Timothy
< continued from reverse >

You repeatedly complain of the treatment you receive at the Jail. However, time and time again, you swear at the staff, argue with providers, and fabricate your complaints. Your back pain was either false or grossly exagerated. There was no bruising, no muscle spasm, and no explanation for your "paralysis". In addition, your symptoms were not consistent with anatomic neurologic pain patterns. Finally, you repeatedly refused to cooperate with a physician who drove in to the Jail just to examine you. Instead, you threatened him and insulted him.

Your behavior is unacceptable. You push and push to provoke a response, and then, you complain about your treatment We have continued to care for you and will do so in the future. However, if you truly desire better treatment, do not

(1) Threaten staff
(2) Swear at staff
(3) Refuse to cooperate with exams
(4) Fabricate or exagerate problems.

Timmy Murray          5/25/10

# INMATE COMPLAINT FORM

Timothy Murray                     14/14/9                        ISO, R
**Inmate's Name**          **Booking Number**          **Housing Assignment**

**DATE OF INCIDENT:** 5/16/10

**TIME OF INCIDENT:** Between 9:00pm & 10:00 pm.

**PLACE OF INCIDENT:** My cell, & medical

## COMPLAINT

On the above date I was shackled, and belly
chained to go to the shower. As I was walking out
my cell I tripped in the "hole" that's in the middle
of my floor. (which is a drain that has no cover
over it like it should) when I tripped and fell
out into the hallway (which is wet from piss, and
shit that is coming up from under the tiles where an
inmate use to throw piss and shit out there) "years ago."
I ended up laying in this shit, and piss infested
hallway for over an hour waiting for medical treatment,
my lower back was hurting me so bad I couldn't
ever move my legs. Finally the doctor got here
(which is a doctor that I have had previous problems
with when he told me to suck his dick) when he
gets here he hits my legs with a a little malet
I guess you call it anyway, he said that my
reflexes were good, and therefor nothing was wrong
with my back. He then picked me up into a wheel
chair (not a back board) and took me to medical.
when we got to medical he drug me out of the
wheel chair onto the four of the holding tank, and
then very roughly picked my legs up as high as
he could (I'm screaming the whole time) then
he walks around me and smacked me with his
open hand up side my head and said shut up
pussy. He then leaned over me and started yelling
that my mama was a whore for having such a piece
of shit as me. I told him that when doctor Inglese
found out how he was treating me he was going to be

**Date Filed**                              **Inmates' Signature**        (over)

in his trouble. He then said that he wouldn't get into no trouble, (that he would probably get a raise.) He then told me that I was going to stay in the holding tank for five days because he had to come all the way from his home to deal with a piece of shit such as myself. I was giving one IBU then by the nurse, and nothing at all for the the rest of the night, and most of the next day. my vital signs wasn't even check until 3:00pm the next day. and finally at about 7:00pm I was giving something for pain. I still havn't had any exrays done, or seen another Doctor that will give me proper medical care, and it is now monday night, the 17th, and I was also put back into my cell, and not kept at medical.

I have witnesses that saw how doctor Dilleo treated me. and those witnesses are Lt. Franklin, the two k-9 deputy's that was called out to follow the ambulance (that was never called) and the a building runner. I don't know his name, or the k-9 deputy's names, but I will find out soon, They say that I'm on "Sickcall" for tomorrow, but the doctor that's doing it is Dr. French (which is another Doctor that doesn't treat me right, so I am going to have to refuse to see him as well as Dr. Dillio, because of how they treat me and I am in very bad need of "proper" medical treatment. I am only supose to be treated by the medical director anyway, because of my previous problems with these doctors. He is th only one that treats me as a human, and not as if I'm a dog. Someone please do something to get me the medical treatment I need, and have a right to get.

Timmy Munay

# INMATE GRIEVANCE

(You must send this to the Warden within 30 days of the incident of which you are complaining. Send to the Warden by following proper rules and procedures. Ask for a copy, and print or write legible. Use a separate form for each grievance. Do not file duplicate grievances. The "First Respondent" will respond to you within 15 days however he may request an extension of 5 extra days. If you do not hear from the "First Respondent" within 20 days you may file a Request for a Warden's Review within the following 5 days).

INMATES NAME _Timmy Murray_  CELL LOCATION _A - 78_

INMATE DATE OF BIRTH _06/20/79_  DATE OF INCIDENT _06/20/08_

NAME & LOCATION OF WITNESSES _____

NAME OF STAFF INVOLVED _Doctor Ingless_

SUMMARY OF COMPLAINT _On 06/20/08 I was orderd "by the Doctor" that I should have an extra matress, because of my Sergery on my Shoulder. It's been Seven days and (over)_

IS THIS AN EMERGENCY GRIEVANCE? YES _✓_  NO _____

SPECIFIC RELIEF DESIRED _To recieve my mattress the doctor orde_

INMATE SIGNATURE _Timmy Murray_

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## FOR WARDEN'S USE

Grievance # _____  Date Received _____

Type Grievance _____  Screened by _____

REJECTED: (return & obtain receipt)
_____ Outside the scope of this procedure because grievances

_____ Does not personally affect this inmate
_____ Disciplinary Review Board Decision
_____ Refusal of mail
(specify) _____
_____ Court Decision / Pardon - Parole Board
___x___ Filed more than 30 days after the incident

_____ Duplicate grievance by same inmate
no _____
_____ Other: (specify)

RETURNED: (return & obtain inmate receipt)
_____ Multiple complaints; file separate

_____ Vague complaint; state more facts / clarify
_____ Summarize complaint
_____ Other:

_____ Accepted & referred to

Policy / procedure challenge:  yes _____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## \*\*\*\*\*INMATE RECEIPT OF RESPONSE TO GRIEVANCE

(Revised Grievance must be re-filed within 30 days of the event which is the basis of the Grievance, if you wish to appeal to the Warden you must do so within 5 days of receiving the Response to the Grievance).

_____  _____
(Date)  (Inmate Signature)

## RESPONSE TO GRIEVANCE

To: _Timothy Murray_   Cell Location: _A 78_

From: _P. Escobar_   _Med Administrator_
_____(Respondent)_____   _____(Title/Location)_____

GRIEVANCE

_____ FOUNDED   ✓ UNFOUNDED

REASONS: _The form required to allow you to have_
_a second mattress was routed in to security_
_as stated in the response to your complaint_
_dated 6/25/08. If you still do not have your_
_mattress please talk to the nurse who goes to_
ACTION TAKEN/RECOMMENDATION (If Founded) _your dorm every day_
_____
_____

DISPOSITION OF RECOMMENDATION (If Applicable)_____
_____

_7/11/08_   _[signature]_
_____(Date)_____   _____(Respondent Signature)_____

INSTRUCTIONS TO RESPONDENT: Return this Response to the Warden as quickly as is reasonably possible, but not later than 5 days from the date the inmate signs the receipt of receiving his/her Response to Grievance from the First Respondent.
✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶

### INMATE RECEIPT

(If you wish further review of your Grievance you must sign the following Request for Warden's Review and send it to the Warden within 5 days of receiving this Response. If your Grievance was noted as a Policy/Procedure challenge, the Warden may ask for employee & inmate advisory comments before making his decision. If you object to any particular inmate(s) so participating. List their names(s) below. You will receive the Warden's Decision within 30 days of filing of your Grievance, as the Warden can ask for a 5 day extension to respond().

_____   _____
(Date)   (Inmate Signature)
✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶

### REQUEST FOR WARDEN'S REVIEW

I hereby request review of my Grievance by the Warden, or his designee.

_____   _____
(Date)   (Inmate Signature)
✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶

### FOR WARDEN'S USE

Date Request for Warden's Review Received:_____

✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶✶